**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
at PIKEVILLE**

**CIVIL ACTION NO. 06-67-DLB**

**MELISSA S. HALL**                                                             **PLAINTIFF**

vs.                     **MEMORANDUM OPINION & ORDER**

**MICHAEL J. ASTRUE, Commissioner**[1]
**SOCIAL SECURITY ADMINISTRATION**                           **DEFENDANT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of an administrative decision of the Commissioner of Social Security. The Court, having reviewed the record, will affirm the Commissioner's decision, as it is supported by substantial evidence.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Melissa Hall previously filed two applications for Supplemental Security Income (SSI) payments on April 9, 1996 and December 28, 2001. Both claims were denied, the latter after a hearing before Administrative Law Judge (ALJ) Charles J. Arnold in Hazard, Kentucky on November 7, 2002.[2] That decision became final when the Appeals Council upheld the ALJ's decision on September 4, 2003.

On May 9, 2003, Plaintiff prospectively filed her third application for SSI payments. In her current application, Plaintiff alleges she became disabled on April 11, 1996 due to

---

[1] Although Jo Anne Barnhart was the Commissioner of the Social Security Administration when the complaint was filed, she has been replaced by Michael J. Astrue.

[2] The ALJ's prior decision is part of the record at Administrative Transcript pages 386-391.

her limited education and problems with her back, migraine headaches, and nerves. That application was denied initially and on reconsideration. She thereafter requested a hearing before an ALJ, which was held in Lexington, Kentucky on July 13, 2005. On September 26, 2005, ALJ Arnold ruled that Plaintiff was not entitled to SSI payments. This decision became the final decision of the Commissioner when the Appeals Council denied review on February 25, 2006.

On March 20, 2006, Plaintiff filed the instant action. The matter has culminated in cross motions for summary judgment, which are now ripe for review.

## II. DISCUSSION

### A. Overview of the Process

Judicial review of the Commissioner's decision is restricted to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *See Cutlip v. Secretary,* 25 F.3d 284, 286 (6th Cir. 1994). "Substantial evidence" is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Courts are not to conduct a *de novo* review, resolve conflicts in the evidence, or make credibility determinations. *See id.* Rather, we are to affirm the Commissioner's decision, provided it is supported by substantial evidence, even if we might have decided the case differently. *See Her v. Commissioner,* 203 F.3d 388, 389-90 (6th Cir. 1999). Moreover, even if there is evidence favoring Plaintiff's side, the Commissioner's findings must be affirmed if supported by substantial evidence. *Listenbee v. Secretary*, 846 F.2d 345, 349 (6th Cir. 1988). Similarly, an administrative decision is not subject to reversal merely

because substantial evidence would have supported the opposite conclusion. *Smith v. Chater*, 99 F.3d 780, 781 (6th Cir. 1996).

The ALJ, in determining disability, conducts a five-step analysis. Step 1 considers whether the claimant is still performing substantial gainful activity; Step 2, whether any of the claimant's impairments are "severe"; Step 3, whether the impairments meet or equal a listing in the Listing of Impairments; Step 4, whether the claimant can still perform her past relevant work; and Step 5, whether significant numbers of other jobs exist in the national economy which the claimant can perform. As to the last step, the burden of proof shifts from the claimant to the Commissioner. *See Jones v. Commissioner,* 336 F.3d 469, 474 (6th Cir. 2003); *Preslar v. Secretary,* 14 F.3d 1107, 1110 (6th Cir. 1994).

**B.    The ALJ's Determination**

At Step 1, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her prospectively filed application date of May 9, 2003. (Tr. 22)[3] At Step 2, the ALJ found that while Plaintiff alleged that her scoliosis, headaches, and obesity were disabling conditions, the record did not support her contention that they were severe impairments. (Tr. 25). This finding was consistent with his previous decision. (Tr. 388) However, the ALJ concluded that Plaintiff's mild mental retardation/borderline intellectual functioning was a severe impairment because it limited her ability to perform basic work activities. (Tr. 24). Once again, that finding was consistent with the ALJ's previous decision. (Tr. 388-89).

---

[3] The ALJ noted in his decision that his prior decision contained a detailed summary of the medical and nonmedical evidence which was considered at length in the prior hearing decision, and that summary will be incorporated by reference herein. (Tr. 23)

3

At Step 3, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments severe enough to meet or medically equal, either singly or in combination, any listed impairment in Appendix 1, Subpart P, Regulation No. 4. (Tr. 24) More specifically, the ALJ evaluated Plaintiff's mental status under Listing 12.05 and concluded that she does not meet or equal the requirements for the Listing.

At Step 4, the ALJ concluded that Plaintiff has no past relevant work to which she could return. In fact, Plaintiff testified she has never worked. The ALJ found that Plaintiff retains the residual functional capacity (RFC) to perform a full range of work at all exertional levels. (Tr. 26). From a mental status standpoint, the ALJ restricted her to simple, routine job tasks and instructions at all exertional levels, which the ALJ found was consistent with her daily activities, the medical evidence of record, and her appearance and demeanor at the hearing. (Tr. 26) The RFC was consistent with the ALJ's prior RFC. (Tr. 389-90)

The ALJ therefore proceeded to the final step of the sequential evaluation. At Step 5, the ALJ determined that Plaintiff's restriction to simple routine work does not significantly affect the range of work existing in the national economy. (Tr. 27) Based on an exertional capacity for work at all exertional levels, her age (younger), education background (eleventh grade), and work experience (none), the Medical-Vocational Guidelines (Grid) corresponded with a finding of not disabled. (Tr. 28).

**C.   Analysis**

Plaintiff advances five arguments on appeal. First, that the ALJ failed to find that any of her severe non-exertional impairments imposed any limits on her ability to work. Second, that the ALJ's mental RFC was not supported by substantial evidence. Third, that the ALJ was not permitted to rely on the Grid in finding her disabled, but rather, should

have retained the services of a vocational expert.  Fourth, that the ALJ failed to find that her headaches were a severe impairment.  And lastly, that the ALJ should have concluded that she met the Listing 12.05C and therefore was disabled at Step 2 of the sequential analysis.  Each of these arguments will be addressed in turn.

### 1. The ALJ Committed no Reversible Error in Finding that Plaintiff's Mental RFC Limited her to Simple, Routine Work

In her brief, Plaintiff claims that because the ALJ found her mental impairments were severe, they must have, by definition, had an impact on her ability to do work-related activities.[4]  Therefore, says Plaintiff, the ALJ's failure to identify the effect of her severe mental impairments on her ability to work requires reversal.  Plaintiff also claims the ALJ should not have described her mental limitations in terms of her having an ability to do "simple, routine work." and contests the ALJ's use of "unskilled" work.  Plaintiff's argument in this regard is misplaced.

Regardless of the language used by the ALJ in his decision, the ALJ described Plaintiff's mental impairments in terms of an impairment-related limitation.  More specifically, the ALJ stated that Plaintiff is "restricted to simple, routine job tasks and instructions."  (Tr. 27) Contrary to Plaintiff's argument, the ALJ's mental RFC finding does not specify her skill level.  Although simple, routine work may be considered synonymous with "unskilled" work, the ALJ did not describe Plaintiff's mental limitations in terms of a skill

---

[4] A severe impairment is an impairment which significantly limits a claimant's "ability to do basic work activities."  20 C.F.R. §§ 404.1521, 416.921.  Sections 404.1521 and 416.921 describe basic work activities as the abilities and aptitudes necessary to do most jobs, including the following: physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  *Id.*

level. Rather, it is the Plaintiff who has described the ALJ's mental RFC in terms of her "skill" level. The SSA regulations specifically state that a claimant's RFC is the ALJ's finding of what a claimant can still do despite her limitations. See 20 C.F.R. § 416.945(a). The ALJ's mental RFC limiting Plaintiff to simple, routine work is consistent with this regulation.

Simply put, the ALJ's finding that Plaintiff was limited to performing simple, routine work does take into account her mental RFC, which for reasons stated below, is supported by substantial evidence.

### 2. The ALJ's Mental RFC is Supported by Substantial Evidence

In her brief, Plaintiff argues that the ALJ should have included in his mental RFC Dr. Edward Stodola's findings on his Psychiatric Review Technique form (PRTF) and his summary conclusions on a mental residual functional capacity (RFC) assessment form. More specifically, Plaintiff claims that the ALJ should have included Dr. Stodola's findings of moderate limitations in completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without unreasonable number and length of rest periods; and responding appropriately to changes in the work setting. Plaintiff also argues that the ALJ should have included Dr. Stodola's PRTF findings, such as moderate restrictions in activities of daily living and moderate difficulties in maintaining concentration, persistence and pace.

As pointed out by the Commissioner, Plaintiff's reading of the Mental RFC Assessment Form is overly simplistic. Mental RFC Assessment forms are divided into four sections: (1) Heading; (2) Section I, Summary Conclusions; (3) Section II, Remarks; and (4) Section III, Functional Capacity Assessment and the signature. Section I of the form

6

is designed to record the state agency consultant's analysis of the evidence and his conclusions about the presence and degree of specific functional limitations. Section I does not constitute the mental RFC assessment. Section III of the form is designed to record the mental RFC determination and within that section the consultant/examiner explains the conclusions indicated in Section I, in terms of the extent to which these mental capacities or functions could or could not be performed in work settings. Because Section I of the form is not a residual functional capacity assessment, the ALJ was not required to adopt the limitations that Dr. Stodola espoused therein.

Plaintiff further suggests that Dr. Stodola's limitations on the PRTF Form precluded the performance of unskilled work. More specifically, she claims that Dr. Stodola's finding of moderate restrictions in activities of daily living and moderate difficulties in maintaining concentration, persistence and pace precluded the performance of unskilled work. Although "moderately limited" is appropriate when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired, such a designation does not mean a complete inability to perform or sustain activity. If that were the case, the consultant/examiner would have selected the "markedly limited" checkbox.

In her brief, the Commissioner provides reference authority from the SSA's *Program Operations Manual System* (POMS), which has been viewed within the Sixth Circuit as persuasive authority.[5] See *Drombetta v. Secretary,* 845 F.2d 607, 609 (6th Cir. 1987). More specifically, the Commission argues that because "moderate limited" may mean

---

[5] The POMS is a primary source of information used by Social Security employees to process claims for Social Security benefits. SSA's Program Operations Manual System, https://s044a90.ssa.gov/apps10/poms.nsf/aboutpoms. *See also Washington State Dept. of Soc. and Health Servs. v. Guardianship Estate of Keffeler,* 537 U.S. 371, 385 (2003)

different things to different people, including state agency consultants, the POMS advise looking at Section III of the Mental RFC form for clarification on the consultant's use of "moderate limited." The POMS state that the degree and extent of the capacity or limitation must be described in narrative format in Section III. Section III of Stodola's Mental RFC form states: "PRTF/MRFC dated 11/24/03 is affirmed. Additional MER does not warrant any changes." Those prior Mental RFC and PRTF forms from November 24, 2003 from Dr. Demaree opined reflect an opinion in Section III that "Plaintiff was capable of performing simple, routine tasks. She seemed to get along well with others. She was well groomed. In a task oriented setting, she is capable of performing routine tasks that do not require reading." (Tr. 521).

Dr. Stodola's adoption of Dr. Demaree's previous finding of "simple, routine tasks" as his mental residual functional capacity assessment provides an adequate basis for the Court to conclude that the ALJ's inclusion of simple, routine work in his RFC finding is supported by substantial evidence. Because the findings of the state-agency consultants are consistent with the ALJ's assessment of Plaintiff's mental RFC, their findings provide additional substantial evidence to support the ALJ's mental RFC determination.

As stated by the Commissioner in her brief, it is the degree and extent to which an individual is impaired that determines if a claimant is unable to perform other work. As stated above, Dr. Stodola indicated on his mental RFC form that he agreed with Dr. Demaree's November 2003 opinion, who found Plaintiff could do simple routine work. Accordingly, Dr. Stodola believed that Plaintiff's "moderate limitations" only limited her to simple, routine work. Thus, the record supports the ALJ's determination of Plaintiff's mental RFC.

### 3. The ALJ's Reliance on the Grid was not Reversible Error

Because Plaintiff had no past relevant work, the ALJ had to determine if she could perform other work, which is defined as jobs that exist in significant numbers in the national economy  See 20 C.F.R. §§ 416.920(f), 416.960(c).  Rather than employ the services of a vocational expert, the ALJ looked to the Grids to determine that Plaintiff could do other work. See 20 C.F.R. pt. 404, subpt. P, app. 2. When a claimant's vocational characteristics coincide with the criteria of a rule in the Grids, the existence of jobs in the national economy is established and the claimant is considered not disabled. See 20 C.F.R. § 416.969; 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(b); *Heckler v. Campbell*, 461 U.S. 458, 461-62, 470 (1983).

In this case, at the time of the ALJ's decision, Plaintiff was nineteen years of age, which is defined as a younger individual, could perform work at all exertional levels, had a limited eleventh grade education, and no transferable work skills.  Rather than employ the services of a vocational expert, the ALJ used the Grid Table that corresponded to Plaintiff's residual functional capacity for work at all exertional levels and found that section 204.00 of the Rules directed a conclusion that Plaintiff was not disabled.

Plaintiff argues that the ALJ erred in doing so.  More specifically, Plaintiff argues that because she has non-exertional impairments, the ALJ was required to use a vocational expert and could not rely solely on the grids to make the determination.  Under the facts of this case, the Court disagrees.

The Grids take into account only a claimant's exertional impairments: i.e., strength for sitting, standing, walking, lifting, carrying, pushing and pulling. 20 C.F.R. § 404.1569(a). Therefore, the Grids are inappropriate where a claimant has non-exertional impairments

*which significantly diminish his capacity to work. Urban v. Chater*, 178 F.3d 1297; 1999 WL 97251, No. 97-3885 (6th Cir. 1999) (unpublished); *Kimbrough v. Secretary*, 801 F.2d 794 (6th Cir. 1986) (emphasis added). Thus, claimants must establish a non-exertional impairment that significantly limits their ability to do a full range of work at the designated level. *Miller v. Commissioner*, 76 F.3d 379, 1996 WL 33219, No. 95-3393 (6th Cir. 1996) (unpublished): *Kimbrough*, 801 F.2d at 796-97. If the non-exertional impairment is not significant, the Grids may be used to make the step five determination. 20 C.F.R. § 404.1569a; *Heston v. Commissioner*, 245 F.3d 528 (6th Cir. 2001); *Kimbrough*, 801 F.2d at 796-97.

*Kimbrough* is instructive on this alleged error. In *Kimbrough*, the claimant argued that the ALJ improperly applied the Grid to determine disability because pain is a non-exertional impairment and, therefore, precluded the use of the Grids. The Sixth Circuit stated that it is only when the non-exertional limitation restricts performance at the full range of the designated level that reliance on the Grid is improper. The court held that the ALJ's findings that the claimant had no non-exertional impairments, and could do a full range of sedentary work, had the effect of finding that his non-exertional impairment was not severe enough to prevent him from performing a full range of sedentary work. The court noted that the ALJ considered the claimant's pain in reaching his conclusion that the claimant could not perform medium or light work. Upon finding that the objective evidence did not bear out the severity of claimant's pain, the court found substantial evidence existed to support the ALJ's finding and reliance on the Grids was proper.

Similarly, in the case at bar, the ALJ's finding that Plaintiff could perform the full range of work at all exertional levels had the effect of finding that her non-exertional

impairments were not severe enough to prevent her from performing a full range of work at all exertional levels. The ALJ considered Plaintiff's limitation of simple, routine work in finding that she could perform work at all exertional levels.

Moreover, the record herein contains little evidence that Plaintiff's mental limitations precluded use of the Grids or cause substantial loss in her ability to meet the basic mental demands of simple routine work at all exertional levels. For example, the findings of the state agency psychologist did not indicate that Plaintiff was substantially limited in her mental functional capacity. Even Ms. Amburgey noted that Plaintiff seemed capable of responding appropriately to peers, co-workers, and supervisors, and able to follow through with instructions. (Tr. 281). The record supports the ALJ's conclusion that Plaintiff could perform unskilled work, which involves work that needs little or no judgment to do simple duties that can be learned on the job in a short period of time. *See* 20 C.F.R. § 416.968(a); Social Security Ruling (SSR) 85-15. Moreover, a limitation to unskilled work does not significantly erode the occupational base represented by the Grids. See SSR 85-15, SSR 96-9p.

Because the record does not indicate that Plaintiff had any additional mental limitations, the ALJ was permitted to rely on the Grids to find Plaintiff not disabled. *See Moon v. Sullivan*, 923 F.2d 1175, 1180-82 (6th Cir. 1990) (claimant's mental impairments did not significantly affect his ability to perform a full range of work at the given exertional level, and thus did not preclude the use of the Grids). As a result, Grid Rule 204.00 satisfied the Commissioner's burden of showing that work existed in significant numbers in the national economy which Plaintiff could perform. *See Campbell*, 461 U.S. at 461-62, 470. Accordingly, the Grids provided substantial evidence to support the ALJ's conclusion

at Step 5 of the analysis, and the ALJ did not err in failing to employ the services of a vocational expert.

As discussed above, "the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. Thus, even if the evidence could also support another conclusion, the decision of the ALJ must stand if the evidence could reasonably support the conclusion reached. *Alexander v. Apfel*, 2001 WL 966284 (6th Cir. 2001) (*citing Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).

> **4.    The ALJ Did Not Err in Concluding That Plaintiff's Headaches Were Not a Severe Impairment.**

In her brief, Plaintiff submits that the ALJ gave short-shrift to her assertion that her headaches were severe impairments. More specifically, Plaintiff argues that the ALJ failed to consider her treatment records which show that she had a lengthy history of headaches and received medications for those headaches. Those records include her statements to Certified Physician Assistant Breeding of Mountain Comprehensive Care and treatment notes from the Daniel Boone Appalachian Regional Healthcare Clinic.

In this case, substantial evidence supports the ALJ's finding that Plaintiff's alleged headaches were not a severe impairment. A severe impairment is an impairment which significantly limits a claimant's physical or mental abilities to do basic work activities. See 20 C.F.R. § 416.920(c); see also 20 C.F.R. § 416.921(a) (defining a non-severe impairment); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (stating that an impairment is not severe "only if it is a slight abnormality that minimally effects work ability, regardless of age, education, or work experience."). In addition, a severe impairment must last for a

continuous period of at least twelve months. *See* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 416.905(a), 416.909, 416.920(a)(4)(ii); *Barnhart v. Walton*, 535 U.S. 212, 217 (2002).

Although there is certainly evidence in the record that Plaintiff suffers from headaches, that Plaintiff was examined by health care providers for those headaches, and received medications for those headaches, the record is devoid of any functional limitations opined by any medical provider which stemmed from her headaches. Whether or not the ALJ erred by failing to designate Plaintiff's headaches as severe can be debated by those intellectually inclined, but for all practical purposes, no medical source has found functional deficits resulting from Plaintiff's headaches.

Thus, despite the ALJ's rather terse treatment of Plaintiff's headaches in his opinion, there is simply no record evidence that Plaintiff suffered from any functional deficits resulting from headaches. Although Plaintiff points to medical records that contained diagnoses and/or treatment of headaches, no doctor provided an affirmative statement that Plaintiff's alleged headaches caused any work-related limitations or functional limitations in excess of simple, routine job tasks and instructions. Because Plaintiff has not shown that her headaches prevented her from performing the level of work delineated by the ALJ, substantial evidence supports the ALJ's finding that Plaintiff's alleged headaches were not a severe impairment.

> **5. Because the Plaintiff Failed to Satisfy All the Listing Requirements at 12.05C, the ALJ did not Err at Step 3 by Failing to Conclude that Plaintiff Met or Equaled that Listing.**

The claimant has the burden at Step 3 of the 5-step sequential analysis to establish that she meets or equals a listed impairment. *Evans v. Secretary*, 820 F.2d 161, 164 (6th Cir. 1987). An impairment satisfies the listing only when it manifests the specific findings

described in the medical criteria for that particular impairment. *See* 20 C.F.R. § 404.1525(d). Unless all the requirements of the listing are present, the claimant does not satisfy that listing. *Hale v. Secretary*, 816 F.2d 1078, 1083 (6th Cir. 1987). Upon review of the record herein, the Court also concludes that substantial evidence supports the ALJ's finding that Plaintiff's impairment does not meet or equal Listing 12.05C, the listing for mental retardation.

Listing 12.05 provides, in pertinent part as follows:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied ....

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function ....

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. In her brief, Plaintiff argues that she satisfies the "C" criteria, which she claims is sufficient to establish presumptive disability.

In order to be found disabled under Listing 12.05, Plaintiff must demonstrate that her impairment satisfies the diagnostic description for the listed impairment. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A). Therefore, Plaintiff will meet the listing for mental retardation only "[i]f [her] impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria...." *Id.* (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00A *as*

14

*amended by* 65 Fed.Reg. 50746, 50776 (August 21, 2000)) (emphasis added).  Thus, to meet Listing 12.05C, Plaintiff must establish the following diagnostic description:

> (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning before age 22;
>
> (2) a valid verbal, performance, or full scale IQ of 60 through 70; and,
>
> (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function (i.e., is a "severe" impairment(s) as defined in §§ 404.1520(c) and 416.920(c).

20 C.F.R. Pt. 404, Subpart P, Appx. 1 § 12.05(c), *Foster*, 279 F.3d at 354.

In response to Plaintiff's Listing argument, the Commissioner asserts that it is quite telling that no psychiatrist or psychologist who administered intellectual functioning tests diagnosed Plaintiff with mental retardation, even when the claimant produced otherwise qualifying IQ scores below 70.  While it is true that no examining psychologist made a valid diagnosis of mental retardation, such a finding is not a requirement to satisfy Listing 12.05C.  A review of the record herein reveals that despite Plaintiff's qualifying IQ scores, she has failed to satisfy the requirements of the Listing.

In March 2002, Michele Amburgey, a certified clinical psychologist, examined Plaintiff and administered the Wechsler Adult Intelligence Scale Test (Tr. 278-81).  Plaintiff, who was 18 at the time the test was administered, received a verbal IQ score of 69, performance IQ score of 64, and a full-scale IQ score of 64.  Although those scores would have placed Plaintiff in the mildly retarded range, Ms. Amburgey was hesitant to make such a diagnosis, stating:

> [D]ue to her occasional questionable effort, Malingering is documented on Axis I.  It is estimated that she is functioning at least within the borderline range of intelligence.  Her presentation would suggest that she is functioning

> at a higher level at times. She seemed to provide inaccurate responses seemingly to minimize her abilities.

(Tr. 280-81) (emphasis added). In the conclusion section of her report, Ms. Amburgey stated:

> Ms. Hall was able to understand and follow through with instructions. It was difficult to determine the actual extent of her difficulties due to the potential that she minimized her overall abilities. She seems capable of responding appropriately to peers, co-workers, and supervisors. Emotionally, she did not evidence significant symptoms that would interfere with her abilities in that regard.

(*Id.*)

In May 1999, Clay Black administered the Weschler Intelligence Scale Test for Children where Plaintiff, only 15 at the time, achieved a verbal IQ score of 65, performance IQ score of 65, and full scale IQ score of 62 (Tr. 420). Like Ms. Amburgey, Mr. Black did not make a diagnosis of mental retardation; he merely stated that Plaintiff had intellectual deficits (Tr. 422-23).

In September 2003, Phil Pack, a licensed psychologist practitioner performed a psychological examination and administered the Wechsler Adult Intelligence Scale Test – Third edition (Tr. 470-75). Plaintiff achieved a verbal IQ score of 56, performance IQ score of 50, and a full scale IQ score of 49 (Tr. 473). As was the case with the other psychological examiners, Mr. Pack did not diagnose Plaintiff with mental retardation (Tr. 470-75). Instead, Mr. Pack opined that Plaintiff was a malingerer and exhibited obvious examples of dissimulation despite encouragement to do her best (Tr. 474). Plaintiff seemed obviously concerned with secondary gains and presented a rather unsophisticated approach to malingering (Tr. 474). Mr. Pack stated that during the interview portion, Plaintiff seemed very credible, was talkative, exhibited good social skills, and was able to

16

provide details, dates and names with no difficulty (Tr. 472).  However, when the formal testing began, her demeanor changed (Tr. 472).  Despite explanation of the need for her to do her best on the testing, she received a "0" on the Picture completion (Tr. 472).  Mr. Pack reported that many of Plaintiff's response patterns on the WISC-III test were obvious examples of dissimulation (Tr. 472).  For example, when asked to count 2 + 2, she replied, "that's 3" (Tr. 472).  When asked how many legs a cat has, she replied, "two" (Tr. 472).  When asked the shape of a ball, she replied, a "square" (Tr. 472).  Plaintiff was even unable to identify the days of the week (Tr. 472).  When asked the colors in the American flag, she replied, "green, white, and blue" (Tr. 472).  When asked who the president is, she replied, "I am" (Tr. 472).  When asked who the governor was, she replied, "George Busch, Jr." (Tr. 472).  On the reading portion, she quickly read the letters of the alphabet out of sequence and was only able to identify a couple of sight words (Tr. 473).  Plaintiff also took a great deal of time trying to sound out the simplest sounds or words (Tr. 473).  Plaintiff was also given the Rey 15 Item test, and she malingered on that test as well (Tr. 474).  When the testing was completed, Plaintiff asked Mr. Pack if he was going to write her a good report (Tr. 473).  Mr. Pack concluded that Plaintiff's performance indicated a less than optimal effort (Tr. 473).  Without valid testing, Mr. Pack opined that accurate functional capabilities are difficult to determine (Tr. 474)

     Although the record indicates Plaintiff had valid IQ scores below 70, she has failed to present evidence that her impairments satisfied the diagnostic description of Listing 12.05.  That is, she has failed to show that she had deficits in adaptive functioning before age 22.  Moreover, although the IQ testing was during the relevant time period (prior to age

17

22), the documented history of malingering has made if difficult, if not impossible for examining psychologists to opine that she had deficits in adaptive functioning.

The record does not contain evidence of deficits in adaptive functioning or that her general intellectual functioning was "significantly subaverage" prior to age 22. For instance, Plaintiff attended Fleming Neon High School to Eleventh grade, which contradicts a finding that her general intellectual functioning was "significantly subaverage" prior to age 22. During one of Plaintiff's psychological examinations, Plaintiff's mother said that Plaintiff achieved her developmental milestones of talking, speaking in sentences, and toilet training within normal limits (Tr. 120). At age twelve, Plaintiff's school sent her for an evaluation for learning difficulties (Tr. 118-24). During that evaluation, Plaintiff's mother reported that Plaintiff's hobbies and interests included basketball, football, and watching television, which seemed to be normal age-appropriate activities (Tr. 120). Plaintiff's mother stated that Plaintiff's responsibilities at home included cleaning her room and picking up after herself (Tr. 120). Furthermore, Plaintiff exhibited appropriate social skills, and had no visual, auditory or motor problems during the test session (Tr. 121). By tenth grade, Plaintiff had not manifested deficits in adaptive functioning. Plaintiff's school records for tenth grade show that she was able to participate in the regular education program with modifications for activities requiring use of mathematics skills and socialization skills (Tr. 205). Plaintiff's participation in the regular education program suggests that she did not have significant deficits in adaptive functioning (Tr. 205).

Additionally, a February, 2003 psychological evaluation, conducted when Plaintiff was 19, did not reveal deficits in adaptive functioning. Rather, as pointed out by the ALJ in his decision, Plaintiff was found to have a Global Assessment of Functioning score or 80-

85 (Tr. 559) which is indicative of no more than a slight impairment in social, occupational, or school functioning to absent or minimal symptoms. Her estimated intelligence was in the average range.

Because Plaintiff failed to meet her burden of proving that her impairments met Listing 12.05C, the ALJ properly determined that she did meet the listing. For the reasons stated herein, substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or equal any listed impairment, including Listing 12.05C.

### III. CONCLUSION

Accordingly, for the reasons stated,

**IT IS ORDERED** that the decision of the Commissioner is found to be supported by substantial evidence and is hereby **AFFIRMED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. # 14) are hereby **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. # 15) is hereby **GRANTED**.

A Judgment affirming this matter will be entered contemporaneously herewith.

This 28th day of September, 2007.



Signed By:
*David L. Bunning*  DB
**United States District Judge**

G:\DATA\SocialSecurity\MOOs\7-06-67-Hall MOO.wpd